Ty SAIKI and George Saiki, a Partnership Doing Business Under the Trade Name and Style of International Chick Sexing Association, Appellants,

v.

UNITED STATES of America, Appellee.

No. 16879.

United States Court of Appeals
Eighth Circuit.

Aug. 3, 1962.

Ray G. Moonan, Minneapolis, Minn., for appellants; Arthur D. Reynolds, Minneapolis, Minn., and Johnson & Johnson, Mankato, Minn., with him on the brief.

Harry Marselli, Atty., Dept. of Justice, Tax Division, Washington, D. C., for appellee; Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner, Edward L. Rogers, Attys., Dept. of Justice, Washington, D. C., Miles W. Lord, U. S. Atty., and Murray L. Galinson, Asst. U. S. Atty., Minneapolis, Minn., on the brief.

Before VOGEL and RIDGE, Circuit Judges, and DEVITT, District Judge.

VOGEL, Circuit Judge.

This is an appeal from a final judgment of the District Court denying taxpayers recovery of $23.13 federal employment taxes paid under the Federal Insurance Contributions Act, 26 U.S.C.A. §§ 3101–3126, as amended. The case involves particularly one Harold H. Tatsumi claimed by the government to be an employee of the taxpayers who, in turn, allege him to be an independent contractor. The determination of which is correct resolves this case.

It is asserted by the taxpayers that this is a "pilot action"; that the government has filed deficiency notices demanding federal employment taxes from the taxpayers from March 31, 1951, to June 30, 1960, in the amount of $178,576.23 involving 89 other persons who had separate and individual but similar contracts with the taxpayers. The case was submitted to a jury on the 23rd of January, 1961, with a verdict being returned on the 25th of January, 1961, in favor of the government and denying recovery. Judgment was entered on the jury verdict.

Taxpayers are Ty Saiki and George Saiki, who operate as a partnership doing business under the trade name and style of International Chick Sexing Association. The business of the Association is to supply trained chick sexers to various hatcheries in some fourteen states. The job of a chick sexer is to determine the sex of newly hatched chicks, distinguishing the pullets from the cockerels so that hatchery customers who wish to buy chicks for egg laying purposes can know with near certainty what they are buying. The task performed by the sexers is an extremely skillful one. They utilize methods which have come to this country from Japan. Taxpayers as well as the sexers are of Japanese descent.

Beginning sexers undergo schooling from four to six months. They then work through an apprenticeship and continue approximately three years before being considered fully skilled. First, accuracy is aimed for; and then speed. A fully skilled sexer can determine with a high degree of accuracy the sex of approximately a thousand chicks per hour. The sex is determined by the shape, size, texture and color of the sex organs. These are seen by looking into the chick's anus after inverting the tissue. Unskilled sexers may rupture and kill the birds or err in making the determination. The sexers are paid directly by the hatcheries, not by the taxpayers. They receive from a half cent to one cent per chick. The sexers pay a commission thereon to the taxpayers.

Harold H. Tatsumi and the taxpayers entered into a written agreement similar in form to that entered into between the taxpayers and all of the sexers. The terms of one such contract are set forth in full in footnote No. 1.

1. "—1—
"Memorandum of Agreement.
"This Agreement made this 16th day of December, 1954, by and between Ty Saiki, doing business as the International Chick Sexing Association, party of the first part and hereinafter referred to as the Association, and Ted Okada party of the second part, hereinafter referred to as the Contractor;
"Witnesseth
"Whereas, the Association has pioneered and developed the business of chick sexing and has expended large sums of money in introducing the art of chick sexing in the United States; and,
"Whereas, the Contractor,
"(a) through the instruction, training and assistance received from the Association, will become an expert in determining the sex of baby chicks, and/or baby poults, or
"(b) is already a sexing expert, and desires to contract sexing work through the Association as his appointed agent, and,
"Whereas the Association has entered, or will have entered, into agreements with Hatcherymen in various localities whereby the Association has agreed, or will have agreed, to provide and furnish said Hatcherymen during the hatching seasons of 1955, 1956, 1957 sexing experts for the purpose of determining the sex of baby chicks, and/or baby poults; and,
"Whereas, the Contractor is desirous of entering into an Agreement with the

Taxpayers operate a chick sexing training school in Fresno, California. Here they train prospective sexers. No tuition is paid by the students, but they

Association for the purpose of carrying out the terms and conditions of those certain Agreements which will be assigned to the Contractor by Memorandum of Agreement, marked 'Exhibit A' which is attached hereto, or may attach hereafter, or may give verbal note and by such reference made a part hereof;

"Now Therefore, in consideration of the mutual covenants, premises and agreements herein contained, It Is Mutually Understood and Agreed as follows:

"(1) That the Association shall assign to said Contractor, from time to time during the seasons of the term herein, whole or part of certain Agreements hereinbefore referred to, and shall where and when necessary advise and instruct said Contractor in the work to be done;

"(2) That said Contractor shall, from time to time, report to such Hatcherymen as may be designated in writing by the Association, and shall proceed to determine the sex of baby chicks, and/or baby poults, for the Hatcherymen so designated in a proper, efficient and expert manner in accordance with the terms of said Memoranda of Agreement by and between the Association and said Hatcherymen;

"(3) That said Contractor shall give his exclusive services as a sexing expert for the seasons of 1955, 1956, 1957, and also for such additional period of service as the Association, or said Hatcherymen shall deem necessary to conform to all the terms and conditions of said Memoranda of Agreement by and between the Association and said Hatcherymen;

"—2—

"(4) That said Contractor shall perform all such sexing work with an accuracy of at least ninety-five per cent (95%) and if said Contractor fails to maintain this percentage of accuracy in his work of determining the sex of baby chicks, and/or baby poults, under the terms and conditions herein set forth, or otherwise fails to do his work in a satisfactory manner, then, and in that event, at the sole option of the Association, this Agreement may be cancelled and terminated. In this connection, it is understood and agreed that said Contractor shall be responsible for the payment of any adjustments which said Hatcheryman may claim as a result of inaccurate sexing, or damage to chicks, and/or poults, while performing sexing work, or any damage on the premises connected therewith;

"(5) That said Contractor shall present weekly reports of all sexing work performed, including any sexing work performed for any Hatcheryman, or Hatcherymen, with whom the Association has no written or verbal agreement, during the term of this Agreement to the Association at its office in Mankato, Minnesota, or to any other office specified by the Association;

"(6) That within ten days after written demand is made by the Association, said Contractor shall pay to the Association as commission and in pursuance of the terms of this Agreement the following percentages of the gross compensation received from the Hatcheryman, or Hatcherymen, for whom said Contractor may perform sexing work during the following years:

"Twenty-five per cent (25%) during the year 1955.

"Twenty per cent (20%) during the year 1956.

"Fifteen per cent (15%) during the year 1957.

"(7) That the Association may retain a reasonable sum, the amount of which is to be determined by the Association on the basis of the reports received as to the quality of the sexing work performed by said Contractor, from the sexing moneys due said Contractor to pay any and all proper claims, damages and/or adjustments which may be incurred by said Contractor in pursuance of the terms of this Agreement, which sum may be retained for a period of ninety (90) days after each hatching season and for any additional period, then said sum, so retained, shall be paid to said Contractor. In this connection, it is understood and agreed that in the event that such claims for damages and/or adjustments should exceed the sum, so retained, said Contractor shall, upon written demand of the Association, pay such excess to the Association at its office in Mankato, Minnesota, or to any other office specified by the Association, within ten days after the receipt of such written demand;

"—3—

"(8) That during the life of this Agreement, said Contractor shall not make or enter into any Agreement or Contract, or perform any work or labor as a sexor for any Hatcherymen or Poultrymen; nor shall he teach any person, or persons, the art of chick, and/or poult, sexing; nor shall he disclose to any persons, or person, the names, addresses

(the students) do pay for the chicks they use and their own living expenses. There are no other costs. Tatsumi was not trained at taxpayers' school.

Taxpayers advertise their business and make contracts with prospective chicken hatcheries for the furnishing of chick sexers. The form of agreement between the taxpayers and the various hatcheries is set forth in footnote No. 2.

Taxpayer Ty Saiki pioneered, developed and has been engaged in the business

or details of any Agreement between the Association and the Hatcherymen, without first having obtained the written consent of the Association;

"(9) That upon the expiration of this Agreement, said Contractor shall not, for a period of three years thereafter, solicit or perform any work or labor as a sexing expert, or sexing teacher, for any Hatcherymen or Poultrymen, directly or indirectly, who are, or will have been, customers of the Association during the term of this Agreement, without first having obtained the written consent of the Association;

"(10) That said Contractor is not an agent or employee of the Association, but is an independent Contractor, anything herein contained to the contrary notwithstanding;

"(11) That the Association may require said Contractor to deposit with the Association the sum of two hundred dollars ($200.00), or the equivalent thereof, said sum to be retained by the Association for the life of this Agreement as surety for the faithful performance by said Contractor of the covenants, premises and agreements herein contained. In this connection it is further understood and agreed that upon the satisfactory performance of the covenants, premises and agreements herein contained, said sum, or its equivalent, so retained, shall be returned to said Contractor by the Association upon the expiration of this Agreement;

"(12) That the Association shall have a lien upon any moneys earned by said Contractor by virtue of this Agreement for service rendered by said Association as agent for said Contractor, and for any money or moneys advanced to said Contractor by the Association; and that said Contractor authorizes the Association to collect from said Hatcheryman or Hatcherymen, any money earned by the Association as said Contractor's agent, or for money advanced, or for any other obligation assumed by said Contractor under the terms of this Agreement.

"In Witness Whereof, the said parties to these premises have hereunto set their hands, the day and year first above written.

"INTERNATIONAL CHICK SEX-
ING ASSOCIATION,
"TY SAIKI,
"TY SAIKI,
"Party of the First Part (The Association),
"TADASHI T. OKADA,
"Party of the Second Part (The Contractor)."

2. "A 5568                    Sexor's Copy
"MEMORANDUM OF AGREEMENT
"THIS AGREEMENT made and entered into this ........ day of ........, 19..., by and between TY SAIKI an individual doing business under the name and style of THE INTERNATIONAL CHICK SEXING ASSOCIATION, of Mankato, Minnesota, party of the first part, and ............................
....................................
of ......................., party of the second part, WITNESSETH:

"WHEREAS, said party of the first part is engaged in the business of training and instructing persons in the art of determining the sex of baby chicks, and of supplying persons so trained to poultrymen and hatcherymen for the purpose of sexing chicks; and

"WHEREAS, said party of the second part is desirous of engaging said party of the first part to supply said party of the second part with such chick sexing experts for the season of 19..., which such chick sexing experts will hereinafter be referred to as 'experts'; NOW THEREFORE;

"It is understood and agreed that said party of the first part shall provide .............. expert, or experts, for the use of said party of the second part for said season at his hatchery, or hatcheries, located at .....................
....................................
and said party of the second part agrees to pay said expert, or experts, for such services the sums as hereinafter set forth, subject, however, to a lien for services rendered, or moneys advanced, if any, by said party of the first part to said experts.

"It is understood and agreed that said chick sexing season shall commence on the .......... day of .........., 19..., and shall continue thereafter throughout

of furnishing chick sexers in the United States since about 1933. From 1938 until 1953 he conducted by himself the business known as the International Chick Sexing Association. In 1953 his brother George became his partner and the business has been operated by them as a partnership since that time.

Harold H. Tatsumi, with whose relationship to the taxpayers we are particularly concerned here, was born in Canada, taken from there to Japan at the age of six years, where he resided from 1936 to 1950. He learned chick sexing in Japan. He returned to Canada in May, 1950, where he did chick sexing "as an independent contractor". Subsequently he entered into a contract with the National Chick Sexing Association in Chicago, Illinois. Ultimately he signed a contract with the taxpayers in Mankato, Minnesota, and since January 9, 1956, has been under continuous contract with them. He has been a permanent resident of the United States since 1956.

Taxpayers filed, under protest, a federal employment tax return with reference to Tatsumi, covering the third quar-

the entire hatching season, and terminate no later than the .......... day of .........., 19..., and said party of the first part agrees that such expert, or experts, shall within said period determine the sex of baby chicks in a proper manner, and as hereinafter set forth, and said party of the second part hereby agrees to pay for such services the sum of .......... for all chicks sexed, and any and all sums payable under this contract by said party of the second part shall be due and payable after each sexing job, unless otherwise specified in writing.

..................................
..................................

"It is understood and agreed that the STANDARD PROVISIONS printed on the reverse side of this agreement constitute a part of this contract, as though fully herein set forth.

"INTERNATIONAL CHICK SEXING ASS'N, ..........................

"P. O. Box 142, Mankato, Minnesota

"TY SAIKI

..........................

"Party of the Second Part.

"By ............. By .............

"STANDARD PROVISIONS

"Said expert, or experts, supplied by said party of the first part shall be fully qualified to determine the sex of baby chicks at an average speed of from 500 to 700 chicks per hour, and within 95% accuracy.

"In the event that the percentage of accuracy of the pullets is below the guarantee, said chicks having been sexed by said expert, or experts, of said party of the first part, and by reason thereof the party of the second part is called upon to make any refunds to the purchasers of said chicks, upon proper vouchers being shown to the party of the first part showing such refunds as hav-

ing been made, the party of the first part shall reimburse said party of the second part for any and all such refunds; it being understood and agreed, however, that no reimbursement shall be made for any claim, or claims, made after sixty days from the date of sexing. This shall be the sole remedy of said party of the second part.

"In the event said party of the first part does not provide such expert, or experts, at or about the time provided herein, or within ten days thereafter, or if such expert, or experts, furnished by said party of the first part shall, for any reason whatsoever, cease work under the terms hereof, said party of the second part shall immediately notify said party of the first part, by telephone, telegraph, or letter, and said party of the first part agrees that within ten days from receipt of such notice to furnish said party of the second part with such expert, or experts, as said party of the second part may need. In this connection, if said party of the first part should fail to provide such expert, or experts, as hereinbefore provided, said party of the second part shall then have the right to cancel this agreement as to any and all experts provided herein, remaining liable only for the number of baby chicks whose sex has been determined up to said date at the rate hereinbefore specified.

"Said party of the second part shall use such expert, or experts, exclusively for all of his chick sexing requirements for the entire contract period, unless otherwise specified in writing.

"Said party of the second part shall supply said party of the first part, upon his request, with a written statement of all chicks sexed by said expert, or experts, and all moneys paid for such sexing."

ter of the calendar year 1957. Under protest they paid the tax thereon and in this suit seek to recover it as unlawfully assessed and paid. During the period involved Tatsumi performed services under his contract in the vicinity of Sheldon, Iowa.

Like the other sexers, Tatsumi operated under contract with the taxpayers, and received from the taxpayers notices or cards advising him of the date and number of chicks that each hatchery in his area desired to have sexed. Tatsumi became personally acquainted with the owners and operators of the hatcheries and obtained information from them also. It is important that sexers arrive at the hatcheries as soon after the chicks are hatched as possible. He and four other sexers in their territory made out their own schedules and arrangements. Each sexer furnished his own equipment, which consisted only of an ordinary lamp with a 200-watt bulb costing from three to five dollars. Taxpayers furnished the sexers with labels and a receipt book. A table and a room for sexing were furnished by the hatcheries where the sexing was done. Tatsumi sexed about 900 chicks per hour with 98% or 99% accuracy. The hatchery owners and the five sexers assigned to the territory wherein Tatsumi operated made the determination of how many sexers would be used on each job. The taxpayers had nothing to do with the method used (of which there were several) or the details of the work in making the sex determinations. Tatsumi and the other sexers paid all their own transportation and living expenses.

The sexers worked on a fee basis, collecting their money directly from the hatcheries, and depositing it in their own accounts. At the end of the season they gave to the taxpayers from 7½% to 25% of their income, the amount depending upon how long the sexer had been sexing and also upon whether or not he was a supervisor. The commissions paid to the taxpayers by the sexers are the taxpayers' sole source of income. The sexers established the contract rates with the hatcheries, although the taxpayers did have some influence in setting the prices.

Sexers were not required to work if they did not so wish. They could and did accept or reject work offered to them by taxpayers, especially when the work was outside their "own area". Their contracts prohibited their working through others than taxpayers, though evidence was introduced to show that this was not enforced. Tatsumi made independent contracts with hatcheries which were his "own business".

Evidence was conclusive that each sexer did his own work at his own time and had no immediate supervision. In each area there was one senior sexer, or "supervisor" whose duty it was to make out weekly reports covering the work that had been done. The "supervisor" gained his title automatically by being the most senior man in the area. In return for making out the reports, such supervisor was given a more favorable rate, paying to taxpayers a commission of 2½% less than the other sexers paid. If he wished, he could agree with other sexers in the area to have them share the duties of "supervisor", and thus split the lower commission. Taxpayers assigned sexers to different locations or areas, sometimes changing assignments at request of the sexers.

The contract between the hatchery owners and the taxpayers made the taxpayers liable for any adjustments necessitated by faulty work on the part of the sexers. The sexers by their contract agreed to make themselves ultimately responsible to the taxpayers for faulty works and could be required to post bonds with the taxpayers to guarantee faithful performance. The evidence was to the effect that when the sexers did cause mistakes requiring adjustments approximately 90% of such adjustments were made directly between the sexers and the

**648**

hatchery owners with no intercession by the taxpayers.[3]

After the Social Security Act was expanded to cover agricultural workers and to provide for voluntary participation by the self-employed, the sexers have all participated as self-employed and have themselves reported and paid their own tax. With the single exception of the third quarter of the calendar year of 1957, when taxpayers reported and paid under protest the tax as to Harold H. Tatsumi, they neither retained, collected nor paid any money to be used for the payment of taxes covering the sexers.

In 1939, the Internal Revenue Bureau was notified by letter from attorneys for the International Chick Sexing Association of Fresno, California, that in their opinion the sexers under contract to the Association were not employees within the purview of the Social Security Act. The sexers referred to therein appeared to occupy an identical relationship and to operate under a very similar contract as herein involved. Thereafter frequent examinations of taxpayers' books by agents of the Bureau of Internal Revenue failed to result in any contention contrary to taxpayers' asserted position until 1957 when the government claimed that the taxpayers were subject to the taxes here in controversy and accordingly filed deficiency notices for 1951 up to the present time.

■ The sole issue for determination was whether or not Harold H. Tatsumi was an employee of taxpayers or an independent contractor. By its verdict, the jury found Tatsumi to be an employee. Unless that conclusion is unsupported in the evidence and Tatsumi is an independent contract as a matter of law, the jury finding must be sustained and the judgment of the District Court affirmed.

We turn first to the regulations as a guide to who are employees within the purview of the Act. 26 C.F.R. § 31.3121 (d)–1(c) provides:

"(c) *Common law employees.* (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

"(2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not

3. Supportive of its contention that the sexers here were under the control of the taxpayers and therefore were the employees of the taxpayers, the government argues, *inter alia*, that the three following factors weigh in favor of the establishment of an employer-employee relationship:

The sexers formed a union and petitioned for recognition but it was not successful. It is contended that this shows intent on the part of the sexers that they were employees.

The taxpayers entered into a written contract in 1959 with the Wisconsin Hatcheries Association Cooperative, whereby sexers who operated in Wisconsin were supposed to pay and, with one exception, did pay a commission or percentage of their income to the WHAC. It is contended that this shows that the

taxpayers could bind the sexers to a contract made with a third party and that this goes to establish an employer-employee relationship.

The taxpayers brought into this country alien sexers from Japan, expressly stating to both the Japanese and the American governments that the sexers were "employees". (It is explained by the taxpayers that this was done in order to get visa clearance for the sexers.)

Tatsumi, whose contract and tax return are the *only* ones in question here, is not shown to have joined the union, did not work in Wisconsin during the period with which we are here concerned and was not an alien sexer brought over from Japan under the conditions described. This additional evidence relied on by the government loses whatever possible significance it had with reference to Tatsumi.

necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees. If an individual enters into an agreement with another person pursuant to which such individual undertakes to produce a crop or livestock on land owned or leased by such other person and pursuant to which (i) the crop or livestock produced by such individual or the proceeds thereof are to be divided between such individual and such other person, and (ii) the amount of such individual's share depends on the amount of the crop or livestock produced, such individual is, with respect to such undertaking, an independent contractor and not an employee.

"(3) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case."

■ Additional factors to be considered in making the determination are more exhaustively set forth in Restatement (second), Agency § 220 (1956). We consider them here as they are listed in the Restatement:

(a) The control exercised by the taxpayers over the sexers, including Tatsumi, was limited to the placing of the sexers in different areas. No control was exercised over the means or method of doing the work. The sexers were held responsible for results only.

(b) The sexers were each engaged in a distinct business or occupation—that of determining the sex of day-old chicks.

(c) The work was done by specialists without supervision excepting only that a "supervisor" or senior sexer reported on the work after it was done and sometimes made collections therefor.

(d) A definite skill was required in the performance of sex determination. Schooling of four to six months and an apprenticeship of approximately three years were the prerequisites to classification as a highly skilled chick sexer.

(e) The tools of the work were supplied by the sexers although they were minimal. The only things supplied by the taxpayers were receipts and labels. All expenses incurred (transportation, meals, etc.) in connection with the performance of the duties called for by the contract were paid for by the sexers. The place of performance was furnished by the hatchery owners and the taxpayers had no control thereover.

(f) The sexers were retained for three-year periods by written contracts. No right of discharge existed but taxpayers could cancel and terminate the contracts if the sexer failed to maintain at least 95% accuracy in his work or otherwise failed to perform his work in a satisfactory manner.

(g) Payment was controlled by the number of chicks sexed. It varied from one-half cent to one cent per chick. As

called for by contract, the payment was in fact made by the hatcheries to the sexers. The method of payment by the hatcheries to the sexers took two forms. Sometimes the sexers themselves made the collection, banked the money, and at the end of the season paid over to the taxpayers an agreed commission ranging from 7½% to 25% of the gross income. Sometimes the supervisor made the collections from the hatcheries and divided the payment with the other sexers.

(h) Actual sex determination was not the regular business of the taxpayers. Taxpayers' business was to supply sexers to contracting hatcheries. At the end of each season, the sexers would contact the hatcheries and enter into contracts for the following year, fixing prices, sometimes with the assistance of the taxpayers.

(i) The parties attempted to create and believed they were creating an independent contractor relationship. The written contract between them expressly provided:

"(10) That said Contractor [sexer] is not an agent or employee of the Association, but is an independent Contractor, anything herein contained to the contrary notwithstanding;"

During all of the time Tatsumi was under contract with the taxpayers, he reported and paid Social Security Taxes as a self-employed person. All of the other sexers likewise reported and paid taxes as self-employed persons.

(j) The taxpayers are in business as indicated in (h).

■ None of the above factors is supportive of the government's contention that Tatsumi and the other sexers were taxpayers' employees. The requisite right to control, which is the government's main contention here, must, in order to establish the employer-employee relationship, extend "not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished." 26 C.F.R. § 31.3121(d)–1, supra. Here

there is an utter absence of any such control or supervision over the work or the right to control and supervise the work. Judge Learned Hand, in dealing with the problem of control in Radio City Music Hall Corp. v. United States, 2 Cir., 1943, 135 F.2d 715, 717–718, said:

"We accept Article 3 of Regulations 91 as an authoritative definition of the distinction between an 'employee' and an 'independent contractor': it is really no more than a gloss upon the definition contained in Justice Gray's opinion in Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 523, 10 S.Ct. 175, 33 L.Ed. 440. We assumed its conclusiveness in Texas Company v. Higgins, supra [2 Cir.], 118 F.2d 636, 638, and so have the Tenth Circuit (Jones v. Goodson, 121 F.2d 176, 179) and the Seventh (Williams v. United States, 126 F.2d 129, 132). *The test lies in the degree to which the principal may intervene to control the details of the agent's performance*; and that in the end is all that can be said, though the regulation redundantly elaborated it. In the case at bar the plaintiff did intervene to some degree; but so does a general building contractor intervene in the work of his subcontractors. He decides how the different parts of the work must be timed, and how they shall be fitted together; if he finds it desirable to cut out this or that from the specifications, he does so. Some such supervision is inherent in any joint undertaking, and does not make the contributing contractors employees. By far the greater part of Markert's intervention in the 'acts' was no more than this. It is true, as we have shown, that to a very limited extent he went further, but these interventions were trivial in amount and in character; certainly not enough to color the whole relation. If the depositions had constituted the whole evidence upon a trial there would have been no issue

to submit to a jury." (Emphasis supplied.)

See N. L. R. B. v. Steinberg, 5 Cir., 1950, 182 F.2d 850, 857; War Emergency Co-op. Ass'n v. Widenhouse, 4 Cir., 1948, 169 F.2d 403, 406, certiorari denied 335 U.S. 898, 69 S.Ct. 300, 93 L.Ed. 433; Glenn v. Standard Oil Co., 6 Cir., 1945, 148 F.2d 51, 53; Cannon Valley Milling Co. v. United States, D.C.Minn., 1945, 59 F.Supp. 785. See also Knight v. Cameron Joyce & Co., 8 Cir., 1958, 252 F.2d 103, 107; King v. Southwestern Greyhound Lines, Inc., 10 Cir., 1948, 169 F.2d 497, 498, certiorari denied 335 U.S. 891, 69 S.Ct. 245, 93 L.Ed. 428; Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 8 Cir., 1950, 179 F.2d 882.

█ Even some reservation of control in the hands of the taxpayers does not abrogate the independent contractor relationship where the contractor is not deprived of his judgment in the execution of his duties. As stated in Conasauga River Lumber Co. v. Wade, 6 Cir., 1955, 221 F.2d 312, 315, certiorari denied 350 U.S. 949, 76 S.Ct. 324, 100 L. Ed. 827:

" * * * The mere fact that the employer reserves the right to supervise or inspect the work during its performance does not make the contractor a mere servant, where the mode and means of performance are within the control of such contractor."

Accord Sullivan v. General Electric Co., 6 Cir., 1955, 226 F.2d 290, 291. Also in accord is Alexander v. Frost Lumber Industries, W.D.La., 1950, 88 F.Supp. 516, 519, affirmed 5 Cir., 1951, 187 F.2d 27:

" * * * As we view it, these are matters of general supervision affecting the results to be accomplished, and do not indicate control of the means and manner of the performance of the contract. In 14

Ruling Case Law, p. 68, we find the rule relating to control of result as distinguished from that of means of performance to be well stated, as follows: 'As a practical proposition, every contract for work to be done reserves to the employer a certain degree of control,—*at least to enable him to see that the contract is performed according to the specifications.* The employer may exercise a limited control over the work without rendering the employee a mere servant, for *the relation of master and servant is not inferable from the reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative so long as he does it in accordance with the contract.* The control of the work reserved in the employer which makes the employee a mere servant is a control, not only of the result of the work, but also of the means and manner of the performance thereof; where the employee represents the will of the employer as to the results of the work but not as to the means or manner of accomplishment, he is an independent contractor.' " (Emphasis supplied.)

█ The only control present here was the placement of the sexers and the requirement by the taxpayers that the sexers live up to the terms of the contracts with the hatcheries. The sexers were held only for the results of their operations. If they failed to make accurate sex determinations to that degree or percentage provided for by the contract, they were held to an adjustment. We believe this is clearly insufficient to create the employer-employee relationship which the government contends existed. As was said in N. L. R. B. v. Steinberg,[4] supra, 182 F.2d at 856, 857:

" * * * the courts have repeatedly held that an employer has a

---

4. The proceedings in Steinberg arose under the National Labor Relations Act, 29 U.S.C.A. § 141, et seq. The courts have recognized that the common law tests were to be applied in determining the relationship that existed between the parties in Labor Board disputes. See International Brotherhood of Teamsters,

right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms, in order to accomplish the results contemplated by the parties in making the contract, without thereby creating such contractor an employee."

It should be kept in mind that it is the hatchery owners who paid the sexers for their services. Because of that payment, they approach nearer to the classification of employers than do the taxpayers herein. Yet even they could not be properly so termed because they lacked any control over the sexers, holding them responsible only for the results of their work; namely, 95% accuracy in sex determination.

Here the taxpayers take on every aspect of booking agents or brokers for the sexers, arranging engagements for them, in consideration of which they receive a specified percentage of the sexers' earned income derived from the hatcheries. Cf. Radio City Music Hall Corp. v. United States, supra. It should be noted that it is not the sexer who gets paid on a commission basis. It is *he* who pays the taxpayers a percentage of his earnings in exchange for their having arranged the engagements with the hatcheries. In Party Cab Co. v. United States, 7 Cir., 1949, 172 F.2d 87, 10 A.L. R.2d 352, certiorari denied 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496, the court, in determining whether taxicab drivers were employees or independent contractors, said at page 93, of 172 F.2d:

"Another factor which we think strongly militates against the employer-employee relationship is that the 'wages' which afford the basis for the tax were received from the public and not the plaintiff. And the services performed by the driv-

ers and for which such 'wages' were received were rendered directly to the public. Thus the public received the benefit of their services and compensated them therefor. To us it is an anomaly to reason that the drivers were employed by the plaintiff but that they served and received their entire compensation from the public. To hold that the drivers were employees under such circumstances does not, in our view, meet the intent and purpose that the usual common law rule shall be 'realistically applied.' "

The independent contractor status has long been recognized in the law. Parties have a perfect right, in their dealings with each other, to establish such status in order to avoid the relationship of employer-employee. Here the parties made every attempt to create the sexers as independent contractors. The reasons may be one or more of many, but that is not the point. They had a right to the relationship if they desired to create it. We are at an utter loss to point out what additional arrangements should have been made or what arrangements should have been omitted in order to create the sexers as independent contractors. What more these parties could have done to establish the relationship they desired we do not know. By all the tests usually applied to determine status, Harold H. Tatsumi was an independent contractor. The trial court should have so found as a matter of law. Brady v. Southern Ry. Co., 1943, 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239; J. R. Watkins Co. v. Raymond, 8 Cir., 1950, 184 F.2d 925, 927. Having submitted the case to the jury and a verdict having been returned which is without support in the evidence, the motion for judgment notwithstanding should have been granted.

Reversed and remanded.

etc. v. N. L. R. B., D.C.Cir., 1960, 108 U.S.App.D.C. 117, 280 F.2d 665, 670, certiorari denied 364 U.S. 892, 81 S.Ct. 224, 5 L.Ed.2d 188; National Van Lines, Inc. v. N. L. R. B., 7 Cir., 1960, 273 F.2d

402, 403; N. L. R. B. v. Nu-Car Carriers, Inc., 3 Cir., 1951, 189 F.2d 756, 757, certiorari denied 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687.