Vincent M. and Annette K. Ravel v. Commissioner.
Ravel v. Commissioner
Docket No. 1207-66.
United States Tax Court
T.C. Memo 1967-182; 1967 Tax Ct. Memo LEXIS 78; 26 T.C.M. (CCH) 885; T.C.M. (RIA) 67182; September 13, 1967
Bruce Hallmark, *81 Suite 13A, El Paso National Bank Bldg., El Paso, Tex., for the petitioners. Harold Friedman, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the fiscal years ended June 30, 1959, 1960, 1961, and 1962 in the amounts of $11,547.62, $12,531.04, $12,412.30, and $30,775.41, respectively. Various issues raised in the deficiency notice have been agreed to by the parties. The sole issue for determination is whether annual payments of $2,400 made in the year ended June 30, 1959, by the El Paso General Hospital and in the years ended June 30, 1960, 1961, and 1962 by the R. E. Thomason General Hospital to acquire a nonforfeitable annuity for Vincent M. Ravel are includable in the taxable income of petitioners for each year or are they excludable, in whole or in part, by virtue of section 403(b), Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Vincent M. Ravel and Annette K. Ravel, husband *82 and wife, had their legal residence in El Paso, Texas. They filed joint Federal income tax returns for each of the fiscal years ended June 30, 1959, 1960, 1961, and 1962 with the district director of internal revenue, Austin, Texas. Hereinafter, Vincent M. Ravel, individually, will be referred to as the petitioner. Petitioner is a practicing physician specializing in the practice of radiology. For some years prior to the years in question, petitioner had practiced in the El Paso area. During this time, he performed certain radiological work at the El Paso General Hospital. (This hospital is presently known as the R. E. Thomason General Hospital and will hereinafter be referred to as the hospital.) The hospital is a charitable hospital supported entirely by public tax monies. The services performed by it are strictly eleemosynary and no private patient can be kept there unless to remove him would be dangerous to health or unless there is no other space available. Prior to 1951, the hospital had no one specifically designated as radiologist. Various radiologists in El Paso gratuitously took turns at the hospital, but under this arrangement the hospital frequently was without the *83 service of a qualified radiologist. This situation was, at the time the hospital was inspected for accreditation, deemed wholly unacceptable, and accreditation was denied. To remedy this situation, and after consideration of various alternatives, the hospital persuaded petitioner to consider a contract of employment whereby the hospital would be provided with a permanent radiology service which would assure continual coverage. In a letter agreement dated December 29, 1951, petitioner agreed with the hospital as follows: [1]
I hereby agree to operate the x-ray department in El Paso General Hospital, subject to the following conditions: 1. This agreement shall start on January 1, 1952 and will run till terminated by 90 days notice of myself or the board. Notice of such termination is given by the party desiring this termination to the other party at least three (3) months prior to the date fixed for termination. Such notice may be given at any time. The notice shall state the date of termination and shall be delivered to the notified party in person or by registered mail, return receipt requested. *84 3. I agree to furnish a Board Certified Radiologist who will be at the Hospital daily and who will also be available for call at all other times. 4. All fees from private and part paying patients shall be reasonable, and in so far as possible will be fixed by mutual agreement between the Radiologist and the Administrator of the Hospital, and will be collected by the Hospital. 5. I shall receive a guarantee of $500.00 per month plus 50% of collected fees from private and part paying patients. 6. You agree to furnish technicians, clerical help, supplies and equipment. 7. I agree, with the consent of the Administrator and the Staff to set up reasonable rules and regulations for the efficient operation of the Department of Radiology. 8. The foregoing is conditioned upon the approval of the Board of Directors for the Providence Memorial Hospital. 9. I understand this agreement contemplates my personal supervision and operation of the X-ray Department of the Hospital, and that my rights and duties under this contract are not assignable and cannot be delegated to someone else, although work may be done by others in my employ. In 1952, petitioner hired one Charles C. McVaugh *85 (hereinafter sometimes referred to as McVaugh) and later formed a partnership with him. A second agreement between petitioner and McVaugh and the hospital was entered into on November 1, 1956, and provided in pertinent part as follows. [2]
We hereby accept employment to operate the X-Ray Department of El Paso General Hospital subject to the following terms: * * *
2. We agree to furnish a Board Certified Radiologist who will be at the Hospital daily or who will be available for call at all times. 3. All fees from private and part paying patients shall be reasonable, and will be fixed by the Administrator of the Hospital with the advice of the Radiologist and will be collected by the Hospital. In order to minimize the calculations of the fees on the part of the Hospital, *86 where numerous accounts would have to be analyzed at considerable time, effort and expense on the part of the business office, we agree to accept the recommendations of the business office by use of the following formula submitted by the auditor: * * * 4. We shall receive a guarantee of $300.00 monthly in addition to the percentage of fees from private paying patients. In conformance with the policy established by the Board of Directors, an annuity in the amount of $200.00 a month will be purchased by the hospital for Dr. V. M. Ravel. 5. The Hospital agrees to furnish technicians, clerical help, supplies and equipment. 6. Reasonable rules and regulations for the efficient operation of the Department of Radiology will be set up by the Administrator with the advice of the Radiologist. 7. We understand this agreement contemplates our personal supervision and operation of the X-Ray Department of the Hospital, and that our rights and duties under this contract are not assignable and cannot be delegated to someone else, although work may be done by others in our employ. 8. It is further understood that Dr. V. M. Ravel will be the Director of the Department of Radiology. This *87 contract with petitioner and McVaugh was approved by the hospital board on December 17, 1956. Similar contracts were entered into between petitioner and the hospital on October 19, 1959, and again on June 21, 1961. All contracts with the exception of the 1951 contract contained 6-month termination clauses. At a time not specified, William H. Melton was added to the partnership of petitioner and McVaugh. During these various periods, the receipts under the hospital contracts were shared by the partners. This division applied to the guarantee and the percentage portions of the total receipts. In addition, after November 1956, in dividing these receipts, the fact that the annuity was being purchased by the hospital in the name of petitioner was taken into account. While the language of the contracts is not identical, the operation of the radiology service by petitioner was the same under each of them. The parties to these contracts contemplated that petitioner would, except for sporadic absences on account of illness, vacation, etc., personally perform the required services. In pursuance of this understanding, petitioner personally supervised and operated the X-ray Department of the *88 hospital. He personally supervised technicians and saw that the examinations were properly conducted. In addition, he personally interpreted the x-rays and treated hospital patients. Because petitioner was required to bear full personal responsibility of the X-ray Department on a round-the-clock basis, the contracts provided that the diagnostic work could be delegated by him to another certified radiologist in order to cover the X-ray Department during a particular absence of the petitioner, such as a vacation. Ninety-five percent of the diagnostic work of the hospital, however, was personally performed by petitioner. Petitioner was also required to attend and participate in certain regularly scheduled teaching conferences at the hospital. Policies, rules, and regulations for the operation of the department of radiology were set by the hospital administration, although with the advice of the radiologist. Standards for the practice of radiology in the hospital, once set, were controlled by means of the "in-service committee" and the hospital administration. In addition, the fees of petitioner's radiological services were fixed by the hospital administration although with the advice *89 of the radiologist. All nonphysician personnel in the department of radiology were employed by the hospital administration, and all personnel policies were made by the hospital administration. Patients were scheduled for radiological treatment by the hospital administration. In addition, during this period, the following items in the department of radiology were supplied by the hospital: all equipment, supplies, solution, film, developers, and telephone service. In general, petitioner went to the hospital daily, stayed until the work was done, returned on call when needed, and went on teaching rounds and to scheduled meetings. The amount of work required for accomplishing this was all the hospital required of him in his capacity. Though the contracts did not so provide, time off was available on special request and a meal allowance was given to petitioner and to all employees while they were at the hospital. The petitioner carried his own liability insurance but it was not the policy of the hospital to carry liability insurance on any of its personnel. The hospital did not withhold taxes from petitioner's compensation but did withhold a certain percentage for the County Employees *90 Retirement Fund. The retirement fund withholding by the hospital occurred only in the case of those who were employees. In contrast to this arrangement, petitioner had another contractual arrangement by which he had agreed to direct the radiology department at a second hospital, Providence Memorial. Pursuant to this arrangement, he furnished all the supplies, hired all personnel, and had complete control over personnel policy. All that was provided by the hospital were the space and the equipment. At this latter hospital, petitioner received a percentage of gross fees and he himself paid all the expenses of the department, including salaries. The major portion of the actual operation of this department was supervised by petitioner's partners. Pursuant to the contract, on or about November 20, 1956, the hospital applied to Variable Annuity Life Insurance Company for a policy providing for a nonforfeitable annuity for petitioner. The annuity was issued on or about November 29, 1956, with petitioner as annuitant. The maturity date of the policy is November 20, 1978. Since November 1956 the hospital has contributed, pursuant to the contract, $200 each month for the annuity contract. *91 None of the amounts have been reported by petitioners in their joint Federal income tax returns, relying on the exclusion contained in section 403(b). Respondent, in his statutory notice of deficiency, determined that the amounts contributed by the hospital were not excludable from the gross income of petitioners pursuant to section 403(b). Opinion The sole issue for determination is whether annual payments of $2,400 made by the hospital to acquire a nonforfeitable annuity for petitioner are excludable, in whole or in part, by virtue of section 403(b), Internal Revenue Code of 1954. Section 403(b) provides, in part, as follows: (b) Taxability of Beneficiary Under Annuity Purchased by Section 501(c)(3) organization. * * * (1) General rule. - If - (A) an annuity contract is purchased - (i) for an employee by an employer described in section 501(c)(3) which is exempt from tax under section 501(a), * * *
(B) such annuity contract is not subject to subsection (a), and (C) the employee's rights under the contract are nonforfeitable, except for failure *92 to pay future premiums, then amounts contributed by such employer for such annuity contract on or after such rights become nonforfeitable shall be excluded from the gross income of the employee for the taxable year to the extent that the aggregate of such amounts does not exceed the exclusion allowance for such taxable year. The employee shall include in his gross income the amounts received under such contract for the year received as provided in section 72 (relating to annuities). (2) Exclusion allowance. - For purposes of this subsection, the exclusion allowance for any employee for the taxable year is an amount equal to the excess, if any, of - (A) the amount determined by multiplying (i) 20 percent of his includible compensation, by (ii) the number of years of service, over (B) the aggregate of the amounts contributed by the employer for annuity contracts and excludible from the gross income of the employee for any prior taxable year. (3) Includible compensation. - For purposes of this *93 subsection, the term "includible compensation" means, in the case of any employee, the amount of compensation which is received from the employer described in paragraph (1)(A), and which is includible in gross income (computed without regard to sections 105(d) and 911) for the most recent period (ending not later than the close of the taxable year) which under paragraph (4) may be counted as one year of service. Such term does not include any amount contributed by the employer for any annuity contract to which this subsection applies. (4) Years of service. - In determining the number of years of service for purposes of this subsection, there shall be included - (A) one year for each full year during which the individual was a full-time employee of the organization purchasing the annuity for him, and (B) a fraction of a year (determined in accordance with regulations prescribed by the Secretary or his delegate) for each full year during which such individual was a part-time employee of such organization and for each part of a year during which such individual was a full-time or part-time *94 employee of such organization. In no case shall the number of years of service be less than one. Respondent challenges petitioner's right to the benefit of any exclusion. He contends that the relationship between the hospital and petitioner is not that of employer-employee as required by section 403(b)(1)(A)(i). In the alternative, respondent contends that petitioner is not a full-time employee for the purpose of determining years of service under section 403(b)(4) and that either all or part of petitioner's receipts under the contract with the hospital do not qualify as "includible compensation" within section 403(b)(3). Both of these alternative contentions only affect the computation of the exclusion allowance under section 403(b)(2) which in turn establishes the maximum possible exclusion from gross income under section 403(b)(1). Initially, therefore, we must determine the nature of the relationship between the hospital and petitioner. In short, was petitioner an employee or was he an independent contractor. We are of the opinion that he was an employee of the hospital and that the provisions of section 403(b)(1)(A)(i) are applicable. [3]
*95 Whether a person is an employee or an independent contractor is a question of fact and is to be decided only after consideration of all of the particular circumstances of each individual case. See Chester C. Hand, Sr., 16 T.C. 1410 (1951). Having considered all the factors in the instant case, we are of the opinion that petitioner is an employee of the hospital. Initially we must look to the contracts to determine the relationship created thereby. The contract specifically provides that the agreement contemplated that petitioner would provide personal supervision and operation of the X-ray Department and that he would bear full responsibility in this regard. Respondent, however, notes that under another clause of the same contract petitioner only agreed to furnish a radiologist who would be at the hospital. He would have us read this clause so as to negate the conclusion that what the parties contemplated was petitioner's personal supervision. We do not consider this to be a proper interpretation of the contracts. Rather, the two clauses must be read together. We believe *96 that both the hospital and the petitioner contemplated a situation in which petitioner was to personally operate and supervise the X-ray Department. This is borne out by the actual conduct of the parties under the contracts, to wit, petitioner was at the hospital daily and personally performed 95 percent of the diagnostic work. Petitioner testified, and we agree, that the purpose of the clause relied on by respondent was to enable him, during any absence from the hospital, to provide for another radiologist to cover the diagnostic function of the department for him. His ability to delegate this function during an absence was a necessity because under the contracts petitioner was responsible for providing, and the hospital required for accreditation, the availability of a certified radiologist at all times, day or night, every day of the year. We are of the opinion that to read the two clauses, as respondent has urged us to do, would be to do so in a vacuum and would be totally at odds with the intent of the parties and with their actual operation. We think it clear that the provisions of the contract, particularly in light of the actual conduct of the parties, make it clear that *97 the relationship created was that of employer-employee. Respondent also argues that there is a lack of effective control by the hospital over the petitioner's actual services. It is our opinion, however, that this factor must be related to the circumstances of the type of services being performed. See Wendell E. James, 25 T.C. 1296 (1956). Petitioner is a professional man, a certified radiologist. We are convinced that the hospital, through the "in-service committee" in particular, "controlled" petitioner's activities sufficiently to satisfy the concept of control as an indicium of an employer-employee relationship. As we stated in the James case, supra, at 1301: [The] control of an employer over the manner in which professional employees shall conduct the duties of their positions must necessarily be more tenuous and general than the control over nonprofessional employees. * * * The other factors of the relationship between the hospital and petitioner are, in the main, indicative of the relationship of employer-employee. Of particular note are the facts that petitioner *98 was compensated by the hospital and not by individual patients and that because the hospital was a charitable institution petitioner was unable to treat any private patient there, except under emergency circumstances. In addition, the hospital, and not petitioner, had complete control over and paid for personnel, equipment, and supplies. The following statement appearing in the James case, supra, at 1300, is equally applicable to the facts before us: His employment was continuous and general, that is, to do the pathological [here radiological] and laboratory work necessary and customary in hospitals over an extended period of time for an annual salary. It was not to do such work for individual patients on a case basis. He was working for the hospital corporation by the year and not for individual patients "by the job." We are aware, as respondent points out, that petitioner did not work a fixed number of hours and that the hospital did not withhold taxes from his salary. Though the contracts do not contain the terms "employer," "employee," or "position," the second contract does describe the relationship as "employment"; however, we do not think that the presence or absence of *99 such labels is decisive. Though those factors may be relevant, on the facts before us we hold that they are not controlling. Suffice it to say that having considered all of these factors and weighing them accordingly we have concluded that the record as a whole supports the holding that the relationship between the hospital and petitioner was that of employer-employee. [4]
In the alternative, respondent has argued that even if the relationship of employer-employee be found, petitioner, on the facts before us, is nonetheless precluded from any exclusion under section 403(b). The exclusion allowance of section 403(b)(2) is equal *100 to 20 percent of the employee's includable compensation for the taxable year multiplied by the number of years of his service reduced by any amounts contributed by the employer which are excludable in prior taxable years. Thus, it is necessary, in order to apply the formula, to establish (1) includable compensation, (2) years of service, and (3) amounts contributed and excludable for any prior taxable year. In regard to the first element, "includable compensation," respondent submits that the portion of the total receipts constituted by the percentage of the fees charged by the hospital of private paying patients does not qualify because they did not result from the employee relationship. He concludes that the total of "includable compensation" is zero because the monthly guaranty is not separable from the nonqualifying percentage. In the alternative, he argues that the amount of compensation resulting from the employee relationship is limited to the amount of the guaranty. We are of the opinion that both the guaranty and the percentage of fees are "includable compensation" within the purview of section 403(b)(3). There is nothing in the language of the statute, nor in respondent's *101 own regulations, that would tend to support his contention. Both the guaranty and the percentage were received by the petitioner-employee from the hospital-employer for his services to the hospital. The percentage arrangement for computing his compensation does not alter the fact that he was compensated by the hospital and not by individual patients. See Wendell E. James, supra.Cf. Saiki v. United States, 306 F. 2d 642 (C.A. 8, 1962). The fees were set by the hospital with petitioner's advice and were collected by the hospital. See also, S. Rept. No. 1983, to accompany H.R. 8381 (Pub. L. 85-866), 85th Cong., 2d Sess., p. 150 (1958). In reference to the second element, "years of service," under section 403(b)(4)(A) there is included one year for every year of full-time service. Under section 403(b)(4)(B), fractions of a year are computed for parttime employees or full-time employees. Respondent contends that because petitioner does not have fixed or regular hours or a minimum number of required hours it is, therefore, impossible to compute "years of service." *102 Respondent's theory is grounded upon the premise that petitioner is a parttime employee. Petitioner argues that he was a full-time employee during the period in question and that the lack of fixed hours, therefore, does not preclude the proper computation of "years of service." We agree with petitioner. Respondent's regulations set out the test of full-time employment as follows: (4) Full-time employee for full year. (i) * * * In determining whether an individual is employed full-time, the amount of work which he is required to perform shall be compared with the amount of work which is normally required of individuals holding the same position with the same employer * * * (ii)(a) In measuring the amount of work required of individuals holding a particular position, any method that reasonably and accurately reflects such amount may be used. * * *
(c) In case an individual's position is not the same as another with his employer, the rules of this paragraph shall be applied by considering the same position with similar employers or similar positions with the same employer. [Regs. sec. 1.403(b)-1(f) *103 ] We are of the opinion that petitioner qualifies as a full-time employee within the meaning of the above-quoted regulation. Petitioner was personally responsible for all the radiology work at the hospital on a 24-hour, 365 days-a-year basis and the parties have stipulated that the amount of work the petitioner has always been required to perform for the hospital is the same amount as that which would be required of any other person in a similar relationship with the hospital. He personally performed 95 percent of the diagnostic work of the department. We are satisfied that the lack of fixed or a minimum number of required hours, on the facts before us, is not fatal to petitioner's case. The requirement of "full-time" must be viewed in relation to the type of employment under consideration. We are convinced that petitioner was a full-time employee, as the term is used by the statute. Having determined elements one and two, the third element is reduced to a mere mathematical computation which the parties can dispose of under Rule 50. We, therefore, hold that petitioner is entitled to the benefit of the proper exclusion under section 403(b). Decision will be entered under Rule *104 50. Footnotes
1. Prior to contracting with petitioner, the hospital had contacted the American College of Radiology to insure the terms of the contract conformed to professional standards of ethics and propriety.↩
2. Although this contract is between the hospital and petitioner and McVaugh rather than with petitioner individually, as are the others involved herein, it appears that the operation was the same under all the contracts. The final two contracts entered into on October 19, 1959, and June 21, 1961, were worded in the first person singular, as was the first contract dated December 29, 1951, set forth above.↩
3. Respondent has conceded, for the purposes of this case, that the hospital may be considered as an organization described in section 501(c)(3) which is exempt from tax under section 501(a). The parties have also agreed that the annuity does not qualify under section 403(a)(1)↩ and that petitioner's rights under the contract are nonforfeitable, except for failure to pay future premiums.
4. We have considered the authorities relied on by respondent and it is our opinion that they are factually distinguishable from the instant case. See: Azad v. United States, an unreported case (D. Minn. 1966), 18 A.F.T.R. 2d 5482; Willard Storage Battery Co. v. Carey, 103 F. Supp. 7 (D.C.N.D. Ohio 1952). See also Saiki v. United States, 306 F. 2d 642 (C.A. 8, 1962), and Rev. Rul. 66-274, 1966-2 C.B. 446↩.