Robert H. Cowing and Margaret O. Cowing v. Commissioner.
Cowing v. Commissioner
Docket No. 540-68.
United States Tax Court
T.C. Memo 1969-135; 1969 Tax Ct. Memo LEXIS 159; 28 T.C.M. (CCH) 696; T.C.M. (RIA) 69135; June 30, 1969, Filed Thomas R. Manning, 25 *162 Park St., Adams, Mass., for the petitioners.lawlence A. Wright, for the respondent. 697 RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income taxes for the taxable years indicated in the amounts set forth below: 1963
$6,601.98
1964
5,570.87
1965
4,754.05 Certain matters relating to these deficiencies have been ssues: (1) whether petitioner Robert H. Cowing was an employee of a hospital during the taxable years so that amounts paid by the hospital for an annuity payable to him were not includible in his gross income by reason of section 403(b), I.R.C. 1954; (2) whether certain deductions and an investment credit, all related to travel made in aircraft owned and operated by petitioner, were properly claimed. Findings of Fact General The parties have submitted a stipulation of facts, which together with the exhibits attached thereto is incorporated herein by this reference. Petitioners Robert H. and Margaret O. Cowing, husband and wife, lived in Williamstown, Massachusetts, at the time the petition in this case was filed. They filed their joint Federal income *163 tax returns for the taxable years 1963, 1964, and 1965 with the district director of internal revenue in Boston, Massachusetts. Robert H. Cowing, who will be hereinafter referred to as petitioner, was during the years here involved a doctor of medicine specializing in radiology. Issue 1. - Section 403(b) Annuity During 1962, petitioner entered into an agreement with the North Adams Hospital of North Adams, Massachusetts (hereinafter sometimes referred to as "the hospital"), which agreement provided as follows: AGREEMENT made this 1st day of of May, 1962, by and between ROBERT H. COWING, M.D., of Williamstown, Massachusetts, hereinafter called Doctor, and NORTH ADAMS HOSPITAL, a duly organized corporation with principal place of business at North Adams, Massachusetts, hereinafter called Hospital. WITNESSETH: WHEREAS the Doctor is a physician with a specialty in radiology and is duly licensed to practice this profession within the Commonwealth of Massachusetts; and WHEREAS the Hospital is duly established for said purposes and is equipped and desires to render radiological services; and WHEREAS it is the desire of the Hospital to assure to itself the association of *164 the Doctor as supervisor and manager of its Radiological Department; NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto do agree as follows: 1. The Doctor as a physician practicing his specialty shall manage and supervise the Radiology Department of the Hospital. This shall include the formulation and execution of all policies concerning the operation of said department in a manner consistent with the general policies of the Hospital as established from time to time by the Board of Trustees of the Hospital. Without limiting the generality of the foregoing, it is expressly agreed that the Doctor shall (a) have the exclusive authority to establish the salary or compensation of all persons employed by the Hospital in said Department of Radiology including the salary or compensation of any other physicians so employed, and the Hospital does expressly agree that it shall enter into no contract of hire with any person, physician or otherwise, pertaining to employment in said Department of Radiology without the prior approval of the Doctor, and that the Hospital will terminate any contract so entered into by the Hospital at the request *165 of Doctor, and (b) have the right, subject to the approval of the Board of Trustees, to establish all rates and charges rendered by the aforesaid Department of Radiology. The Doctor does hereby agree to perform the duties required of him to the best of his abilities and shall provide for competent supervision of the Department of Radiology during his absence therefrom to attend medical meetings, lectures, conventions and for other purposes. 2. The Doctor shall continue to so manage and supervise the Department of Radiology until April 30, 1992, unless this contract is terminated prior thereto by notice in writing by either party hereto given to the other at least ninety days prior to the termination date or by the Doctor's death. 3. So long as the Doctor shall continue to manage and supervise the Department of Radiology of the Hospital, he shall be paid a monthly sum equal to (i) 40% of the net billings made by the Hospital 698 during the month for services rendered by the Department of Radiology (net billings shall be determined by deducting from the gross billings made by the Hospital the compensation paid to the persons other than physicians employed within said department), *166 (ii) less the sum of five hundred (500) dollars, (iii) less an amount equal to the compensation paid to other physicians engaged within said department during the month. When the Doctor ceases to so manage and supervise the Department of Radiology of the Hospital, the following additional compensation shall be paid to him or to his estate as the case may be: (a) If the Doctor ceases to so manage and supervise the Department of Radiology of the Hospital (otherwise than by death, upon a date effective after the Doctor attains the age of sixty (60) years, he shall be paid a monthly income in accordance with Column I of Schedule A which is attached hereto and made a part hereof. The first payment of said monthly income shall be made to the Doctor on the first day of the month next ensuing the effective date of such termination and shall be paid to him on the first day of each month thereafter so long as he is living, provided, however, that if he shall die before the appropriate sum set forth in Column II of the aforesaid Schedule A shall have been paid to him in monthly installments, said monthly installments shall continue to be paid to his estate until the hospital shall have paid *167 the appropriate amount in Column II. (b) If the Doctor ceases to so manage and supervise the Department of Radiology of the Hospital because of the Doctor's death, the appropriate sum indicated on Schedule B attached hereto shall be paid in one lump sum to his estate within sixty (60) days of the date of death. (c) If the Doctor ceases to so manage and supervise the Department of Radiology of the Hospital (otherwise than by death) before he shall have attained the age of sixty (60) years, the appropriate amount indicated on Schedule C shall be paid to him or his estate each month for one hundred twenty (120) months, the first such payment to be paid to him on the first day of the month next ensuing the date he so ceased to manage and supervise the Department of Radiology of the Hospital. If the Doctor shall die before 120 such installments have been paid to him, the remaining installments shall be paid to his estate. 4. Neither the Doctor, his estate, nor any other person claiming through or under him shall have any right to assign, transfer or anticipate any of the payments due under paragraph 3 hereof. 5. Hospital shall create a reserve for the purchase of new equipment *168 and shall deposit therein a sum equal to 4% of the billings made by the Hospital for services rendered by the Radiology Department. Expenditures from this reserve account shall be under the exclusive control of the Doctor. IN WITNESS WHEREOF the North Adams Hospital has caused its corporate seal to be hereto affixed and these presents to be signed by , its , and said Robert H. Cowing, M.D. has hereunto set his hand and seal the day and year first above written. NORTH ADAMS HOSPITAL By /s/ Herbert S. Gordon Its President /s/ Robert H. Cowing, M.D. Robert H. Cowing, M.D. [Schedules omitted] Schedule B referred to in the contract provided for payments upon the death of petitioner from age 41 through age 70. Schedule C referred to in the contract provided for payments upon termination of employment from age 45 through age 59. Petitioner was born on January 4, 1922. Pursuant to the agreement, the hospital purchased an annuity for petitioner from the National Life Insurance Company of Montpelier, Vermont. The annuity contract called for annual premium payments of $5,918.33 to continue for 30 years. The hospital is an exempt organization described in section 501(c)(3), I.R.C. *169 1954. During the years at issue, petitioner's only gainful employment was as a radiologist at the hospital, with the exception of several times that he "covered" for a Dr. Guare, a radiologist at Putnam Memorial Hospital in Bennington, Vermont, located approximately 20 miles from the North Adams Hospital. Dr. Guare, in turn, would cover for petitioner on occasion. Each would pay the other for such services. Petitioner served during the years at issue as a consultant in radiology to Williams College, in Williamstown, Massachusetts, but he received no payment for this. Petitioner has no office at his home or at any place other than at the hospital, and was not engaged in any private practice. Prior to the years in issue, petitioner had 699 occasionally covered for a radiologist at the Adams Hospital in Adams, Massachusetts. When that radiologist died, petitioner discussed with the board of trustees at North Adams Hospital the possibility of taking on the radiology duties at the Adams Hospital, but, because of objections from the trustees, petitioner did not do so. During the years at issue, petitioner was the only radiologist at the North Adams Hospital and was responsible for *170 all radiological services. He would generally arrive at the hospital at 8:30 a.m. during the week and remain there all day; he sometimes worked on Saturdays and was on call 24 hours a day. If petitioner was to be absent from the hospital, he had to provide a replacement, but he did not have to ask permission to leave. The radiology department of the hospital employed about five technicians and one secretary during the years at issue. They were paid by the hospital. In practice petitioner would recommend the hiring of applicants, and his choice would then be subject to approval by the hospital administrator. The hospital's X-ray equipment was owned by the hospital, and purchases of new equipment were made from a hospital reserve fund (consisting of deposits of 4 percent of all billings from radiological services) under petitioner's exclusive control pursuant to paragraph 5 of his agreement with the hospital. Patients receiving radiological services, whether hospital patients or out-patients, were billed by the hospital and not by petitioner. The hospital's fees for radiological services are set by the board of trustees, but are recommended by petitioner. His recommendations, which *171 accord with the Blue Cross-Blue Shield schedules, have never been rejected. The hospital board of trustees appoints a hospital administrator, who in turn employs the heads of various departments of the hospital, such as physical therapy, dietary service, nursing, electrocardiology, electroencephalography, maintenance, business, and housekeeping. The heads of these departments are considered hospital employees. The heads of the radiology and pathology departments are employed by contract, but still operate within the administrative structure of the hospital and are subject to hospital regulations. The medical staff of the hospital contains departments of surgery, medicine, obstetrics, and pediatrics. The members of the medical staff are not considered by the hospital administrator to be hospital employees. He considers petitioner to be both a member of the medical staff and an administrative department head. The hospital withheld income tax from petitioner's salary during the years in issue. On his income tax return for the years in issue, petitioner included in his income no amount in respect of payments made by the hospital for the annuity. In the notice of deficiency, the Commissioner *172 determined that petitioner's income should be increased by $6,000 for each of the years in issue because of amounts paid by the hospital for the annuity. Petitioner was an employee of the North Adams Hospital for the years in issue within the meaning of section 403(b), I.R.C. 1954. Issue 2. - Travel Related Items Petitioner learned to fly aircraft in about 1955 after settling in North Adams. One reason for his learning was to save time in travel to and from medical meetings in Boston. During the years in issue, both petitioner and his wife were licensed instrument pilots, and petitioner owned, consecutively, three different airplanes. Petitioner's pilot log books for the years in issue were introduced in evidence. They indicate, occasionally in an unintelligible or indecipherable manner, the date, duration, departure point, destination point, flying time, and purpose of trips made by petitioner in his aircraft. In his log books, petitioner indicated with asterisks those trips he considered to be "business-related". Petitioner's log book for 1963 reveals 191 hours and 20 minutes [1] of flying time, of which 157 hours and 50 minutes (approximately 83 percent *173 of the total) were marked by asterisks. During 1963, petitioner spent a total of $3,794.49 for gasoline, maintenance, and insurance for his airplanes. On his tax return for 1963, he deducted 90 percent of that amount, or $3,415.05, under "Transportation" expenses. [2] In his notice of deficiency, the Commissioner allowed these expenses to the extent of $1,177.65 700 (approximately 31 percent of the total spent). Petitioner further deducted on his 1963 tax return "Depreciation" on airplanes and equipment in the amount of $2,176.30, which figure purports to be 90 percent of the depreciation computed by the straight line method. [3] In his notice of deficiency, the Commissioner allowed a depreciation deduction to the extent of $240.27 (approximately 11 percent of the total depreciation claimed). Petitioner further claimed on his 1963 return an investment credit of $735 in respect of his purchase of an airplane, which credit was disallowed in full by the Commissioner in his notice of deficiency. *174 Petitioner incurred and deducted "Travel" expenses (for hotel, meals and other items) of $1,578.93 for various trips taken in his plane in 1963. The Commissioner allowed as deductions $571.99 of this amount (approximately 36 percent of the total claimed). The stated purpose of these trips, their dates, [4] the amounts of the claimed deductions attributable thereto, the amounts allowed by the Commissioner, and the flying time involved (taken from the log book) are set forth below: Date: 1963
Purpose
Deduction Claimed
Deduction Allowed
Flying Time
1. 1/18 - 1/26
American Academy of Orthopedic Surgeons, Miami Beach, Fla.
$ 408.78
$ 75.00
16:55
2. 3/27 - 4/13
American Radium Society Meeting San Francisco, California
512.95
153.66
63:30
3. 5/ 1 - 5/ 3
Arteriography Conference, Mt. Sinai Hospital, New York City
117.00
117.00
2:55
4. 5/29 - 5/31
Lectures, Peter Bent Brigham Hos- pital, Boston, Mass.
72.14
72.14
2:10
5. 6/22 - 6/23
Flying Physicians Meeting, Montauk Point, Long Island, New York
30.00
2:10
6. 8/18 - 8/23
Flying Physicians Meeting, Aurora, Illinois
205.26
11:00
7. 10/ 2 - 10/ 3
Washington, D.C.
30.00
6:10
8. 10/ 8 - 10/11
American Roentgen Ray Society Meet- ing, Montreal, Canada
132.76
93.90
4:05
9. 10/18 - 10/19
New England Roentgen Ray Society Meeting, Brookline, Mass.
39.54
29.79
2:20
10. 10/25 - 10/27
Peter Bent Brigham Hospital, Boston, Mass. 30.50
30.50
2:10
TOTALS
$1,578.93
$571.90
113:25
*175 Petitioner's wife accompanied him on some of the trips, including those to Miami Beach, San Francisco, Montauk Point, and Montreal, and shared flying duties with him. It is not necessary by law to have a copilot on an airplane like petitioner's, even to fly by instruments. In those cases where petitioner was accompanied by his wife, the claimed deductions for travel expenses include her expenses as well as his. The expenses consisted primarily of amounts paid for meals, lodging, taxis, laundry, registration fees, and entertainment. The flight to Miami Beach for the meeting of the American Academy of Orthopedic Surgeons took four days (January 19 through January 22) [5] and involved overnight stays in Allentown, Pennsylvania; Newport News, Virginia; Brunswick, Georgia; and West Palm Beach, Florida. On January 23, petitioner and his wife made a side trip to Nassau, in the Bahamas, where petitioner and a friend had organized "under British law" a corporation called Acoaxet Limited to deal in real estate. The corporation has invested in and sold four house lots, but when the investment was made does not appear in the record. Petitioner is and was president of the company and one of *176 its board of directors. The corporation was 701 still in existence at the time of trial, but was making no profits during the years in issue. Petitioner has never received compensation or dividends from the corporation. Petitioner's trip to Nassau was for a board of directors meeting of the corporation as well as to look into the possibility of having it invest in certain real estate. The return to North Adams from this trip was made by commercial airline from Nassau as petitioner's plane broke down. Included in $408.78 expenses claimed by petitioner in respect of the Miami Beach trip was the amount of the commercial airlines fare of $170.10 for himself and his wife. Petitioner's trip to San Francisco for the meeting of the American Radium Society involved six days to fly to San Francisco, three days in San Francisco, and nine days to fly back. The trip out included an overnight stay in Akron, Ohio, a two-day stopover in Denver, Colorado, and a three-day stopover in Las Vegas, Nevada. The *177 trip back included a three-day stay in Tucson, Arizona, overnight stays in Lake Charles, Louisiana, and Pascagoula, Mississippi, and a four-day stay in St. Petersburg, Florida. Petitioner made two trips in 1963 (listed above) to meetings of an organization called the Flying Physicians, made up of physicians interested in flying. The meetings of this group included seminars on various aspects of flying and on various aspects of medicine in general and its application to flying in particular. Petitioner's trip to Washington, D.C., set forth in the table, was taken with the hospital administrator and one of its trustees for the purpose of meeting with certain Congressmen and governmental agencies to inquire about securing Federal grants for the expansion of the hospital. No specific presentation was made with regard to enlarged radiology facilities; rather the proposal concerned a new wing for the hospital. Petitioner made the trip in his capacity as president of the medical staff of the hospital to attest from a medical point of view to the need for enlarged facilities. In connection with petitioner's trip to the meeting of the American Roentgen Ray Society in Montreal, on which *178 he was accompanied by his wife, his claimed deduction for travel included the amount of $34.40 for entertaining two doctors, one of whom had covered for petitioner at one time (prior to the taxable years) at the North Adams hospital and the other of whom was associated with Massachusetts General Hospital in Boston. Of the 157 hours and 50 minutes of flying time marked by asterisks in petitioner's log book for 1963, 113 hours and 25 minutes were in connection with the ten trips set forth in the table above. The remaining 44 hours and 25 minutes of flying time considered by petitioner as business related included six trips to Massachusetts General Hospital totaling 14 hours and 5 minutes. The rest of the time marked by asterisks relates to trips for which the explanations in the log book either are indecipherable or give no satisfactory basis upon which to determine their business or nonbusiness character. Petitioner's log book for 1964 reveals 233 hours and 40 minutes of flying time, of which 182 hours (approximately 78 percent of the total) were marked by asterisks. During 1964, petitioner spent a total of $4,743.25 for gasoline, repairs, insurance, landing fees, charts, and miscellaneous *179 items for his airplanes. On his tax return for 1964, he deducted 90 percent of that amount, or $4,268.92, under "Transportation" expenses. [6] In his notice of deficiency, the Commissioner allowed these expenses to the extent of $2,158.94 (approximately 50 percent of the total spent). Petitioner further deducted on his 1964 tax return "Depreciation" on airplanes and equipment in the amount of $2,795.83. In his notice of deficiency, the Commissioner allowed a depreciation deduction to the extent of $1,576.60 (approximately 56 percent of the total). Petitioner further claimed on his return an investment credit of $751.80, computed by taking the applicable figure based on the purchase of a new airplane ($1,486.80) less the $735 claimed on the 1963 return. In his notice of deficiency, the Commissioner allowed the credit to the extent of $433.65. Petitioner incurred and deducted "Travel" expenses of $1,927.77 for various trips taken in 1964. The Commissioner allowed as deductions $693.62 (approximately 36 percent of the total claimed). The stated *180 purposes of these trips, their dates, the amounts of the claimed deductions attributable thereto, the amounts allowed by the Commissioner, and the flying time involved (taken from the log book) are set forth below: 702 Date: 1964
Purpose
Deduction Claimed
Deduction Allowed
Flying Time
1. 2/ 2 - 2/20
American College of Radiology, Tucson, Arizona
$ 370.20
$100.55
* 58:15
2. 3/13 - 3/27
Seminar: Evolving Concepts in Pul- monary Diseases, Miami, Fla.
650.75
253.83
[2] 27:25
3. 9/20 - 9/26
Pulmonary Disease Symposium, Den- ver, Colorado
287.80
192.76
16:25
4. 9/27 - 10/ 1
Flying Physicians Meeting, Palm Springs, California
231.03
8:30
5. 10/ 2 - 10/10
Aircraft Owners & Pilots Association, Fort Lauderdale, Florida
241.51
[3] 30:40
6. 11/ 3 - 11/ 4
Post Graduate Assembly, Boston, Massachusetts
30.70
30.70
2:30
7. 11/18
Massachusetts General Hospital, X-ray Conference
18.38
18.38
2:15
8. 11/20
New England Roentgen Ray Meeting, Boston, Mass.
12.50
12.50
2:10
9. "Weekly"
Massachusetts General Hospital 84.90
84.90
20:50
TOTALS
$1,927.77
$693.62
[4] 169:00
*181 The expenses claimed as deductions above consisted primarily of amounts paid for meals, lodging, taxis, automobile rental, and laundry. The trip to Tucson, Arizona, for the meeting of the American College of Radiology took four days and included stopovers in Birmingham, Alabama, and Dallas, Texas. The meeting lasted at most three days. The return trip took 13 days and included stopovers in Tampico, Florida; St. Petersburg, Florida; Daytona Beach, Florida; and Norfolk, Virginia. The trip to Miami, Florida, for the Seminar on Evolving Concepts in Pulmonary Diseases included a stopover in St. Petersburg and a side trip to Nassau. Petitioner attended the Pulmonary Disease Symposium in Denver, Colorado, the Flying Physicians meeting in Palm Springs, California, and the Aircraft Owners and Pilots Association meeting in Fort Lauderdale, Florida, in the course of one trip. He left North Adams on September 20, spent nights in Williamsport, Pennsylvania, and Indianapolis, Indiana, and arrived in Denver on September 22. On September 27, he left Denver and arrived in Palm Springs. On October 2, he left Palm Springs and arrived in San Diego, California. On October 4, he left San Diego, spent *182 nights in Carlsbad, New Mexico, and Pensacola, Florida, and arrived in Fort Lauderdale on October 6. On October 10, he left Fort Lauderdale and arrived in North Adams. The Aircraft Owners and Pilots Association is a nationwide organization of persons who own and fly airplanes. Petitioner's interest in its meeting was occasioned at least in part by the fact of his relationship to the Mohawk Valley Aviation Corporation, which owns and operates the North Adams airport. Petitioner owned 22 percent of the stock of the corporation and was a corporate officer. During the years at issue, petitioner received no officer's compensation and no dividends from the corporation. The corporation owned two large maintenance hangers as well as various aircraft that were available for chartering in North Adams. Of the 182 hours of flying time marked by asterisks in petitioner's log book for 1964, 139 hours and 40 minutes were in connection with the trips set forth above. The remaining flying time marked by asterisks relates to trips for which the explanations in the log book either are indecipherable or give no satisfactory basis upon which to determine their business or non-business character. *183 Petitioner's log book for 1965 reveals 244 hours and 15 minutes [7] of flying time, of which 234 hours and 5 minutes (approximately 91 percent of the total) were marked by asterisks. During 1965, petitioner spent a total of $3,769.53 for gasoline, insurance, landing fees, charts, registration, and miscellaneous items for his airplane. On his 703 tax return for 1965, he deducted 90 percent of that amount, or $3,392.58, under "Transportation" expenses. [8] In his notice of deficiency, the Commissioner allowed those expenses to the extent of $2,192.58 (approximately 58 percent of the total spent). Petitioner further deducted on his 1965 return "Depreciation" on his airplane and equipment in the amount of $4,500. The Commissioner allowed this deduction to the extent of $1,125 (25 percent of the total depreciation). Petitioner incurred and deducted "Travel" expenses of $1,918.18 for various trips taken in *184 1965. The Commissioner allowed as deductions $1,791.63 of this amount (approximately 94 percent of the total claimed). The stated purpose of these trips, their dates, the amounts of the claimed deductions attributable thereto, and the flying time involved (taken from the log book) are set forth below: Date: 1965
Purpose
Deductions Claimed
Flying Time
1. 2/13 - 2/27
Flying Physicians Meeting, various locations in Mexico
$ 612.37
47:10
2. 3/12 - 3/20
Post-graduate course in Gastrointestinal Roent- genology, Miami, Florida
343.68
17:30
3. 4/28 - 4/30
New York Roentgen Ray Society New York City, New York
98.00
2:50
4. 5/12
Cancer Conference, Boston, Massachusetts
2.50
2:15
5. 5/15
Flying Physicians Meeting, Groton, Connecticut
8.00
2:10
6. 5/20 - 5/21
Massachusetts Medical Society Annual Meeting, Boston, Massachusetts
36.10
2:20
7. 8/22 - 8/26
Flying Physicians Meeting, Miami Beach, Florida
174.69
11:15
8. 8/27 - 9/ 3
Acoaxet Limited, Nassau, Bahamas
116.00
14:05
9. 11/28 - 12/ 2
Roentgen Ray Society Meeting, Chicago, Illinois
218.54
18:50
10. 12/27 - 12/31
Acoaxet Limited, Nassau, Bahamas
282.85
9:50
11. 1/12, 10/13, 10/14, 10/26, 11/3-10
X-ray Conferences, Boston,Massachusetts 25.45
11:10
TOTALS
$1,918.18
139:25
*185 Petitioner was accompanied by his wife on certain of the above trips, including those to Mexico, Miami, New York City, and Nassau (both times). The amounts deducted include her expenses. Petitioner's trips to Nassau were made in connection with Acoaxet Limited. The audit of petitioner's 1965 income tax return was a "desk" audit and was conducted by the use of different methods from those used in the "field" audits of the 1963 and 1964 returns. If similar methods had been used, there would have been greater disallowance for 1965. Of the 234 hours and 5 minutes of flying time marked by asterisks in petitioner's log book for 1965, 139 hours and 25 minutes were in connection with the trips set forth above. Of the remaining time marked by asterisks, 13 hours and 15 minutes were in connection with trips (not included in the table above) to Massachusetts General Hospital in Boston, 8 hours were in connection with a trip to Nassau (not included in the table above), and 29 hours and 55 minutes were marked "airport rental". The remaining flying time marked by asterisks relates to trips for which the explanations in the log book either are indecipherable or give no satisfactory basis upon *186 which to determine their business or non-business character. Certain other adjustments contained in the deficiency notice are not presently in controversy having been either not put in issue in the petition or settled at trial. Opinion RAUM, Judge: 1. Section 403(b) annuity. The first issue before us is whether amounts paid by the hospital for an annuity are taxable to petitioner. The governing statutory provision is section 403(b), [9] and the primary 704 dispute is whether petitioner was an "employee" of the hospital during the years in question within the meaning of the statute. If he was an employee, the parties are agreed that no part of the annuity payments are includible in his income. Since we hold that he was an employee, we need not resolve the question of how much the hospital paid for the annuity in the years in issue nor consider petitioner's alternative argument that his rights under the annuity are forfeitable (and thus not includible in his income in any event). *187 The term "employee" is not defined in section 403(b), but it is reasonable to conclude that the distinction between an employee and an independent contractor in this context is to be made on common law grounds, as it is often made elsewhere in the Internal Revenue Code. See, e.g., section 3121(d)(2) of the Code; section 1.1361-4, Income Tax Regulations; section 31.3401(c)-1, Employment Tax Regulations. The test involved here, in general terms, depends to a large extent on the degree to which a principal may intervene to control the details of the performance of his agent. Radio City Music Hall Corp. v. United States, 135 F. 2d 715, 717 (C.A. 2). At some point the power to control becomes great enough that the agent becomes an employee rather than an independent contractor. Section 31.3401(c)-1 (b) of the Employment Tax Regulations, dealing with the definition of "employee" for income tax withholding purposes, elaborates on the control test: (b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and *188 direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer, Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely 705 as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee. Before examining the extent of control involved in petitioner's case, it should be pointed out that the control test must be applied only after taking into account *189 the nature of the work to be performed. Professional workers, such as doctors, present a different case from that of workers performing more routine or mechanical duties. As was said in Wendell E. James, 25 T.C. 1296, at 1301: * * * Therefore, the control of an employer over the manner in which professional employees shall conduct the duties of their positions must necessarily be more tenuous and general than the control over nonprofessional employees. Yet, despite this absence of direct control over the manner in which professional men shall conduct their professional activities, it cannot be doubted that many professional men are employees. See also, Azad v. United States, 388 F. 2d 74, at 77 (C.A. 8): From the very nature of the services rendered by physicians and other professionals, it would be wholly unrealistic to suggest that an employer should undertake the task of controlling the manner in which the professional conducts his activities. The question of whether petitioner was an employee or an independent contractor during the years in issue is one of fact. Chester C. Hand, 16 T.C. 1410, 1414. While there are factors present *190 here that might lead to either conclusion, we are satisfied that the evidence as a whole supports petitioner's contention that he was an employee. In making this judgment, we are mindful of the standard of control applicable to professional workers and also of the fact that the nature of petitioner's job must be considered in the light of not only his contract with the hospital, but also his actual practices on the job. Factors in this case indicating employee status are often intertwined with factors pointing to the opposite conclusion, but we will here list the factors most important in our determination. Petitioner was paid by the hospital rather than by individual patients. The hospital provided the space and equipment for petitioner's work. Petitioner was the only radiologist at the hospital during the years in issue and was personally responsible for all radiological work. Other than covering for a radiologist at another hospital, petitioner had no other remunerative work than at the hospital during the years at issue. Petitioner worked regular hours at the hospital, sometimes including Saturdays, and was on call 24 hours a day. Employees of the radiology department were employed *191 and paid by the hospital. As the head of the radiology department, petitioner was subject to hospital regulations and operated within the administrative structure of the hospital. Petitioner's power to formulate department policies and to establish radiology rates was subject to approval by the hospital's board of trustees. His power in hiring, dismissing, promoting, and setting wages for the radiology employees, while not limited by the contract, were in practice subject to the approval of the hospital administrator. Factors somewhat limiting the above, and thus indicating independent contractor status, are as follows: While petitioner was paid by the hospital, he was paid a percentage of the net billings of the radiology department, less certain amounts; further, the fees charged were determined by petitioner, although subject to the approval of the board of trustees. The fees thus fixed by petitioner have never been rejected, but it should be noted that they conform to the Blue Cross-Blue Shield standard rates. Although the hospital provided the radiology equipment with which petitioner worked, under the terms of the contract he had exclusive control over the fund set aside by *192 the hospital for the purchase of new equipment. While petitioner was actually responsible for the radiological work performed at the hospital during the years in issue, his contract did not explicitly prohibit him from delegating his duties to another. We think, however, that the contract, fairly construed, contemplated the personal performance of petitioner. Although petitioner had no outside compensable employment during the years in issue, other than covering for another radiologist, his contract did not prohibit such outside employment. We do note, however, that when a radiologist at another hospital died and petitioner was offered his position, he declined because of objections from the board of trustees at the North Adams Hospital. While petitioner did work regular hours, none were specified in his contract. While the employees of the radiology department were hospital employees, as mentioned above, petitioner had the right to establish their salaries and to prevent the hospital from hiring or continuing the employment of any such person of whom 706 he disapproved. The hospital administrator never disagreed with petitioner in these matters except for suggesting in one case *193 a higher salary than that recommended by petitioner. Finally, while petitioner was more a part of the administrative structure of the hospital than would be an ordinary member of the medical staff, he and the head of the pathology department were less administrators than the heads of other administrative departments. We recognize that the matter is not entirely free from doubt but we think that, considering the duties and position of petitioner, the scales tip in favor of the conclusion that he was an employee of the hospital. The factual nature of the problem was noted in Azad v. United States, 388 F. 2d 74 (C.A. 8), involving a radiologist, where the Court of Appeals distinguished a memorandum opinion of this Court which also involved a radiologist (p. 78): We have carefully examined the decision of the Tax Court in Vincent M. Ravel, 26 T.C.M. 885 (September 13, 1967), filed subsequent to the submission of this case. The working agreement between Dr. Ravel and the El Paso General Hospital is readily distinguishable from the present case and supports the Tax Court's finding that the petitioner there was an employee of the hospital. The Tax Court in Ravel, *194 moreover, was aware of the district court's decision in this case, and properly recognized the distinguishing factual features. Vincent M. Ravel, supra, n. 4. In our view the facts of the instant case more closely resemble those in Ravel than those in Azad. Both cases involved the definition of "employee" in section 403(b), and both involved radiologists under contract to hospitals. In Azad it was thought to be of great significance that the parties felt that no employer-employee relationship existed. 388 F. 2d at 77-78. Here, in contrast, the hospital withheld income taxes from petitioner's salary, and the hospital administrator considered him a hospital employee. Further, in Azad, not only was the taxpayer allowed by his contract to have employment elsewhere, but he did in fact have other employment. Finally, his relationship to the hospital administrative structure appeared to have been no different from that of any member of the medical staff, while petitioner here, as head of the radiology department, was more integrated into the hospital administration. The Ravel case is closer to our case. Nearly all of the elements present here were present *195 there. Respondent points to the facts that Ravel was paid a monthly minimum salary as well as a percentage of fees, that his work was reviewed by an "in-service committee", and that he had no control of equipment purchases. While these factors, absent in petitioner's case, do tend to indicate employee status, we do not find their absence crucial here. Moreover, Ravel, through his participation in a partnership, performed services for a hospital other than the one that purchased the annuity in issue, and there was no withholding from his salary for Federal income taxes. In these respects the present case is stronger than Ravel. In reaching our conclusion that petitioner was an employee during the years in issue, we have taken into account the ruling in Rev. Rul. 66-274, 1966-2 C.B. 446 regarding physicians as employees. Our decision is not inconsistent with that ruling. In discussing the nature of the requisite control and supervision, the ruling mentions four general criteria: * * * (1) the degree to which such individual has become integrated into the operating organization of the person or firm for which the services are performed; (2) the substantial nature, *196 regularity, and continuity of his work for such person or firm; (3) the authority vested in or reserved by such person or firm to require compliance with its general policies; and (4) the degree to which the individual under consideration has been accorded the rights and privileges which such person or firm has created or established for its employees generally. We have given due consideration to these criteria in concluding that petitioner was an employee of the hospital. 2. Travel related items. - The second matter before us relates to items connected with travel in petitioner's privately owned aircraft. Petitioner claims that a large percentage of this travel was business related; the Commissioner concedes that some was business related, but a much smaller amount than claimed by petitioner. The following table is helpful in illustrating the differences between the parties concerning amounts: 1963
1964
1965
Flying time marked by asterisks
83%
78%
91%
Aircraft transportation expenses claimed
90%
90%
90%
Aircraft transportation expenses allowed
31%
50%
58%
Depreciation allowed
11%
56%
25%
Travel expenses allowed
36%
36%
94% 707
*197 a. "Travel" expenses. It is convenient to deal first with the "travel expenses" (primarily meals and lodging) claimed in connection with the trips set forth in the tables in our findings of fact. Petitioner relies on section 162(a) [10] and 212 [11] to justify the deduction of these expenses. It is undisputed that the amounts claimed were actually spent; the controversy concerns the amount that is properly deductible. While the record is not detailed enough for us to make a precise finding of the amount of allowable deductions attributable to these trips, we are convinced that, with a minor exception, the amount is no larger for any of the years in issue than that allowed by the Commissioner, whose determination, with the one exception, in this regard must be sustained. *198 There are several reasons why the amounts claimed by petitioner are not deductible in full. First, petitioner's wife accompanied him on many of the trips involved, especially those to resort areas. The deductions taken include her expenses. While she gave petitioner some assistance in flying his aircraft, we are not convinced that such assistance (which was not required under law) served any business purpose that would make her travel expenses "ordinary and necessary" under either section 162 or section 212. Cf. William E. Reisner, 34 T.C. 1122, 1131. Second, we are convinced that much of the travel for which deductions were taken was for the personal pleasure of petitioner and his wife and unconnected with any business or income-producing activity. While there is no dispute that petitioner's attendance at medical meetings and conventions was helpful to his professional competence, the time involved in traveling to and from these events was often quite disproportionate to the amount of time spent at the meetings. For example, petitioner's trip to San Francisco for the American Radium Society meeting in 1963 involved 15 days of travel and at most three days of meeting. *199 The travel included extended stays in resort areas such as Las Vegas and St. Petersburg. Our findings amply illustrate other such instances. For the years 1963 and 1964 we have the benefit of the Commissioner's allocation for each individual trip. We think it clear from petitioner's log book and statements at trial that much of the travel involved in attending certain of the medical conferences was unnecessary to his business activities and represented personal expense, nondeductible under section 262. It should be noted that travel deductions in connection with certain meetings were allowed in full. In those instances where only a partial deduction was allowed, we find that, considering the presence of petitioner's wife on many of these trips and the personal pleasure aspects of much of the travel involved, the Commissioner's determinations have not been shown to be in error. Finally, deductions for expenses in connection with certain travel were disallowed altogether. With one exception, we agree with the Commissioner's position as to these items. The exception is the deduction relating to petitioner's trip to Washington, D.C., in 1963, made with the hospital administrator and *200 a hospital trustee for the purpose of conferring with Government officials concerning Federal assistance in adding a new wing to the hospital. We find that this trip was made in connection with petitioner's trade or business of hospital employee and resulted in ordinary and necessary expenses deductible under section 162. On the other hand, we cannot find that petitioner's attendance at the meetings of the Flying Physicians bore a proximate relationship to a trade or business or incomeproducing activity of petitioner. Any professional benefit to petitioner from these meetings seems too remote. The expenses incurred in connection therewith were personal expenses. Neither do we find deductible petitioner's expenses in traveling to Fort Lauderdale 708 for the Aircraft Owners and Pilots Association meeting and to Nassau. The former trip was claimed to be connected with petitioner's involvement in the Mohawk Valley Aviation Corporation, and the latter trips were claimed to be connected with petitioner's involvement in Acoaxet Limited. Petitioner was a shareholder and officer of both corporations, but during the years at issue never received any compensation or dividends from either. *201 The expenses connected with these trips cannot be deducted under section 162 because we cannot find in this case that being an unpaid officer constitutes a trade or business. Hirsch v. Commissioner, 315 F. 2d 731 (C.A. 9) affirming a Memorandum Opinion of this Court; Low v. Nunan, 154 F. 2d 261 (C.A. 2), affirming a Memorandum Opinion of this Court. In the Hirsch case, the Court noted that a profit motive must be present and dominate a "trade or business," and that, while the expectation of profit need not be reasonable or immediately fulfilled, the dominant intent behind activities claimed to constitute a "trade or business" must be to make a profit from those activities. 315 F. 2d at 736. It went on to find that the taxpayer, although an active director, officer, and member of the executive committee of a corporation, was not engaged through these activities in a trade or business because he was never compensated for them nor was there a plan that he would ever be. Furthermore, these expenses cannot be deducted under section 212. While petitioner's efforts on behalf of the corporations may have indirectly benefited his shareholdings, the *202 business he was about was that of the corporation, whose business is not the business of its shareholders. Deputy v. Dupont, 308 U.S. 488, 493-494. In Jacob M. Kaplan, 21 T.C. 134, a case involving a similar situation to the one before us, we made the following statement, which is pertinent here as well: * * * Insofar as the petitioner's expenditures related to the production or collection of income, or to the management, conservation, or maintenance of property held for the production of income, it was to the income or property of the corporations and not to that of petitioner. 21 T.C. at 146. With the exception of the disallowance of a $30 expense item in connection with petitioner's trip to Washington, D.C., in 1963, we sustain the Commissioner's determinations for each year with regard to travel expenses. b. "Transportation" expenses. - Under "Transportation" expenses, petitioner deducted amounts spent for gasoline, maintenance, insurance, repairs, landing fees, charts, registration, and other items connected with travel in his aircraft. Again, there is no dispute that the amounts were actually spent; the controversy concerns the amounts *203 properly deductible under sections 162 and 212. A great bulk of petitioner's flying time (to which the above expenses must be attributed) was in connection with the trips set forth in the tables and discussed above under "Travel" expenses. From our discussion it is clear that much of this flying time cannot be considered related to a trade or business or an income producing activity of petitioner. Our findings show that a large portion of the remaining flying time marked in the log book by asterisks (and thus considered by petitioner as business-related) was not accompanied in the log books by enough information to enable us to determine its purpose. Neither was there clarifying testimony at trial concerning these flights. Thus we cannot say that petitioner has carried his burden of proving erroneous the Commissioner's determinations with regard to "Transportation" expenses, with the exception of those connected with the 1963 flight to Washington, D.C., which expenses we assume the Commissioner must have disallowed. Taking into account the flying time involved in the Washington trip, we have estimated and hereby find as a fact that $110 of the total "Transportation" expenses were allocable *204 to this trip; this amount should be added to the deduction allowed by the Commissioner. c. Depreciation. - The claimed depreciation deductions are governed by section 167. [12] Our conclusions concerning the 709 deductibility of the "Transportation" expenses dispose of this issue as well. We sustain the Commissioner's determinations in this regard for each of the years, with the exception of depreciation related to the Washington, D.C., flight, which we find was $70. d. Investment credit. - The claimed investment credits for the purchase of aircraft taken by petitioner on his 1963 and 1964 returns are governed by sections 38 [13] and 48. [14] The determination of amounts allowable depends on the same considerations as above, i.e., how much of the airplane's use was devoted to business or income-producing activities. Petitioner concedes that the credit taken in *205 1963 was, in effect, properly disallowed because the airplane to the purchase of which it was attributable was disposed of in the following year. See section 47. This adjustment was made in petitioner's 1964 return, in which the amount of the 1963 credit was subtracted from the claimed 1964 credit. The Commissioner, however, disallowed a portion of the 1964 credit. In light of our discussion above, we cannot find that this determination was erroneous. *206 Decision will be entered under Rule 50. Footnotes
1. This total differs from petitioner's total of 194 hours contained in the log, which was apparently incorrectly computed. ↩
2. Petitioner's total deductions for "Transportation" were $4,094.44, and included $679.39 for automobile expenses, which the Commissioner does not contest, as well as the $3,415.05 for airplane expenses mentioned above. ↩
3. Depreciation was computed for the two airplanes owned during 1963, and the figure deducted for the second appears to be 100 percent rather than 90 percent of the depreciation.↩
4. The dates given indicate the days of departure from and return to North Adams.↩
5. Petitioner left North Adams on January 18 but returned the same day because flying conditions were bad. The one hour flying time involved on January 18 is included in the table above.↩
6. Petitioner's total deductions for "Transportation" also included $297.38 for automobiles, an amount uncontested by the Commissioner.↩
*. Of this amount, only 46 hours of flying time were marked by asterisks. ↩
2. Of this amount, only 20 hours and 15 minutes of flying time were marked by asterisks. ↩
3. Of this amount, only 20 hours and 35 minutes of flying time were marked by asterisks. ↩
4. Of this total, only 139 hours and 40 minutes were marked by asterisks.↩
7. This total differs from petitioner's total of 241 hours and 55 minutes contained in the log, which was apparently incorrectly computed. ↩
8. etitioner's deductions for "Transportation" also included the amount of $689.38 for automobiles, uncontested by the Commissioner.↩
9. SEC. 403. TAXATION OF EMPLOYEE ANNUITIES. * * * (b) Taxability of Beneficiary Under Annuity Purchased by Section 501(c)(3) Organization or Public School. - (1) General Rule. - If - (A) an annuity contract is purchased - (i) for an employee by an employer described in section 501(c)(3) which is exempt from tax under section 501(a), or (ii) for an employee (other than an employee described in clause (i)), who performs services for an educational institution (as defined in section 151(e)(4), by an employer which is a State, a political subdivision of a State, or an agency or instrumentality of any one or more of the foregoing. (B) such annuity contract is not subject to subsection (a), and (C) the employee's rights under the contract are nonforfeitable, except for failure to pay future premiums, then amounts contributed by such employer for such annuity contract on or after such rights become nonforfeitable shall be excluded from the gross income of the employee for the taxable year to the extent that the aggregate of such amounts does not exceed the exclusion allowance for such taxable year. The employee shall include in his gross income the amounts received under such contract for the year received as provided in section 72 (relating to annuities). (2) Exclusion allowance. - For purposes of this subsection, the exclusion allowance for any employee for the taxable year is an amount equal to the excess, if any, of - (A) the amount determined by multiplying (i) 20 percent of his includible compensation by (ii) the number of years of service, over (B) the aggregate of the amounts contributed by the employer for annuity contracts and excludible from the gross income of the employee for any prior taxable year. (3) Includible compensation. - For purposes of this subsection, the term "includible compensation" means, in the case of any employee, the amount of compensation which is received from the employer described in paragraph (1)(A), and which is includible in gross income (computed without regard to sections 105(d) and 911) for the most recent period (ending not later than the close of the taxable year) which under paragraph (4) may be counted as one year of service. Such term does not include any amount contributed by the employer for any annuity contract to which this subsection applies. (4) Years of service. - In determining the number of years of service for purposes of this subsection, there shall be included - (A) one year for each full year during which the individual was a full-time employee of the organization purchasing the annuity for him, and (B) a fraction of a year (determined in accordance with regulations prescribed by the Secretary or his delegate) for each full year during which such individual was a part-time employee of such organization and for each part of a year during which such individual was a full-time or part-time employee of such organization. In no case shall the number of years of service be less than one. (5) Application to more than one annuity contract. - If for any taxable year of the employee this subsection applies to 2 or more annuity contracts purchased by the employer, such contracts shall be treated as one contract. (6) Forfeitable rights which become nonforfeitable. - For purposes of this subsection and section 72(f) (relating to special rules for computing employees' contributions to annuity contracts), if rights of the employee under an annuity contract described in subparagraphs (A) and (B) of paragraph (1) change from forfeitable to nonforfeitable rights, then the amount (determined without regard to this subsection) includible in gross income by reason of such change shall be treated as an amount contributed by the employer for such annuity contract as of the time such rights become nonforfeitable.↩
10. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; * * * ↩
11. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax.↩
12. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income.↩
13. SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY. (a) General Rule. - There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part. (b) Regulations. - The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B. ↩
14. SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property. - (1) In general. - Except as provided in this subsection, the term "section 38 property" means - (A) tangible personal property, or (B) other tangible property (not including a building and its structural components) but only if such property - (i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.↩